James H. PETTES, Plaintiff–Appellant,

v.

Gordon YUKON, Defendant–Appellee.

Court of Appeals of Tennessee,
Western Section, Jackson.

May 8, 1995.

Application for Permission to Appeal
Denied by Supreme Court
Aug. 21, 1995.

J. Mark Griffee and Robert L. Hutton of Glankler Brown, Memphis, for Defendant.

John R. Smith of Brown, Brasher & Smith, Memphis, for Plaintiff.

CRAWFORD, Judge.

Plaintiff, Jim Pettes, appeals from the order of the chancery court dismissing his complaint against defendant, Gordon Yukon. The only issue for review on appeal is whether the evidence preponderates against the trial court's finding that there was no partnership between the parties.

Plaintiff's complaint filed in January, 1993, alleges that on July 14, 1987, a business entitled "Rent-a-Flick" was sold to Jim Pettes and Gordon Yukon, who had agreed to become full and equal partners. The complaint avers that Yukon paid $42,000.00 for the purchase of the Rent-a-Flick business, and that Pettes had a verbal partnership agreement with Yukon. According to the complaint, the agreement provided that Pettes would be the managing partner and receive a nominal salary in exchange for his partnership interest in the business. Pettes avers that the parties agreed that at the end of each calendar year they would divide equally any profits and "any increase in value derived from the efforts of Pettes in managing the Rent-a-Flick business located on Quince Road and in overseeing the Rent-a-Flick business located on Summer Avenue." He further avers that he took a reduced salary upon an express promise by Yukon that he would have an equal share of the profits and increase in the value of the business. The complaint also alleges that at the end of the first calendar year, 1987, Pettes asked Yukon to divide the profits, and that Yukon refused.

The Summer Avenue store was subsequently moved to Germantown, and the complaint alleges that Yukon attempted to convert the assets and profits of the Quince store to the Germantown store. Pettes states that at the end of every year, from the inception of the partnership to the filing of this suit, he asked for an accounting and distribution of half of the profits and half of the increase in value. He further states that Yukon always refused to do so. A written demand was made by Pettes on December 1, 1992, for an accounting. Shortly thereafter, Yukon changed the locks on the Quince store to prevent Pettes from entering and also advised Pettes and the employees at the Quince store that Pettes had been terminated. The complaint seeks, in addition to a full and complete accounting from July 14, 1987, an injunction to prevent Yukon from interfering with the Quince store location and from diverting its assets. The suit also seeks damages as a result of the breach of the partnership agreement.

Yukon's answer joins issue on the major allegations of the complaint and specifically denies that there was any partnership agreement between the parties. Prior to trial, a consent order was entered limiting the trial to the single issue of whether a partnership existed between the parties. We have reviewed the rather voluminous record, and we will summarize the testimony.

Pettes testified that he graduated from Vanderbilt with a degree in economics, and

that he subsequently began working in 1984 for Video Magic, a video rental business owned by Glenn Hodges. He was technically considered the assistant manager, but his primary duty was taking care of the customers. In the spring of 1987, Pettes became reacquainted with a former classmate, Philip Schaefgen. Schaefgen, a CPA, approached Pettes about Schaefgen's interest, along with Yukon, in purchasing a video rental business. Pettes told Schaefgen that he would not be interested unless he was certain he was going to be a partner. He testified that they then discussed forming a three person partnership. Pettes first met Yukon in the late spring of 1987. According to Pettes, he and Yukon discussed a partnership wherein Schaefgen would handle the accounting, Yukon would primarily be the investor, and Pettes would be the operational manager.

At the time he left Video Magic, Pettes was earning about $20,000.00 per year, and he worked about 40 hours per week. Under the partnership agreement, Pettes would manage two Rent–a–Flick stores and earn the same amount that he earned at Video Magic. He said that Schaefgen withdrew from the deal, but that he and Yukon agreed that they would nevertheless be partners. After Yukon purchased the business, Pettes's work hours increased to 70 to 80 hours per week. Pettes testified that he applied the knowledge learned through his years at Video Magic, to running and managing the two stores. Pettes explained the operation of the business, how the movies were ordered, and testified at length about the responsibility he had undertaken. Pettes testified that his capital contribution was "sweat equity," and that in the many discussions he had with Yukon, Yukon told him that they were $^{50}\!/_{50}$ partners.

Pettes testified that at the end of the first year there were profits from the business, and that they agreed to use the profits to purchase a computer which would increase the value of the business. Pettes testified that after the first calendar year, and until his relationship was terminated in January, 1993, Yukon indicated to him that the stores had not earned any profits. He testified further that he accidentally learned in 1992 that Yukon had placed a value of $134,000.00 on the business.

Pettes acknowledged that when the business first began, he signed an agreement to work for Rent–a–Flick for a period of one year commencing August 1, 1987 at a yearly salary of $19,800.00. He explained that he was told by Yukon that the agreement was to assure him that Pettes would stay. Pettes testified that Yukon was concerned that if Pettes was dissatisfied, he might leave and jeopardize Yukon's investment. After the first year, Pettes did not sign any such agreement. Pettes testified that he was given a W–2 form for the salary that he was paid, and that Yukon told him that he did not need a K–1 until such time as there were profits to be distributed.

Pettes testified that, at Yukon's request, he trained Yukon's daughter, Jeannie, to run the Germantown store. Since Yukon's other daughter, Laurie, was going to graduate from college soon, Pettes felt that it would be prudent to meet with Yukon to formalize the specifics of the agreement. We quote from the record of Pettes' cross-examination:

Q. And I believe also that you testified that in November of 1992 when you became aware that Laurie the other daughter was going to be coming and working at the Quince store and specifically handling the payroll for that store, that you felt that that was a good time to approach Dr. Yukon with regard to working out everything; is that correct?

A. No, that was not said. There was never anything said about her coming to work there. I would not have ever allowed that at that point. All that was said was that he wanted her to take over the payroll. I, knowing him as I do, knew what that indicated. There was no mention of her coming to work there. I would never allow it.

He had asked [about] her working there over the summer when she hadn't gotten the job before. I had let her come for one day and I was very nice to her and then I told her that I would prefer for her to

never come back, in a very nice way, because the Germantown store was going to be their store and she could work there.

Q. Well, I thought you were supposed to be a co-owner of both of these stores.

A. Mr. Griffee, as you well know, after very lengthy deposition testimony, if you want to go through all of this with the Judge again, I explained to you that in the spring of 1992 what led to my agreement for Jeannie to be running the Germantown store was that we would work toward a splitting off of the stores; that he would take the Germantown store for his family, I would take full control of the Quince store and that's why I was cooperating in this manner.

Q. But that would be different than the terms of your alleged initial oral partnership agreement, wouldn't it?

A. It would be a new development in it.

Q. A new development?

A. Yes.

Q. You would be losing control over—or your claim to increase in value in the profits of the Germantown store, would you not?

A. And I would be gaining my claim to the entire value of the Quince store, if we had followed through on that. It seems like it was a pretty fair trade.

Pettes became disturbed in the fall of 1992 when Yukon informed him that he wanted Laurie to take over the payroll at the Quince store. Pettes refused, and things became estranged from that point on at the Quince store which he was managing. Yukon began taking movies from the Quince store location when Pettes was not there and placing the movies in the Germantown store. Pettes became insecure with his relationship in November of 1992, and he was writing his own checks to the Quince store employees and for his own compensation. He testified that he would not have come into the enterprise at all if he had not been told that he was a partner. He testified that there was never any suggestion that this was the mere possibility of a partnership. He further testified that it was decided, prior to the time the business was purchased, that he and Yukon would be partners. Pettes also testified that Yukon held Pettes out as his partner in Yukon's dealings with others concerning the business and in social settings.

Pettes said that at the end of the first business year, Yukon told him that he was extremely pleased with the progress of the business and that Pettes's "sweat equity" was surpassing Yukon's initial capital investment. Although no figures were mentioned, Yukon said "that the sweat equity that I put in through my reduced salary equalled his capital contribution, if not surpassed it. He said that." Pettes acknowledged that he did not get an accounting each year, that he did not get a share of the profits, and that he made no demand upon Yukon for either. He explains that Yukon misled him into believing that he was putting the profits back to increase the value of the business. Pettes acknowledged that he knew that Yukon was presenting Rent–a–Flick as a sole proprietorship in the filing of income tax returns and other required documents.

Jo Ann Rogers testified that she is employed with Coughlin's Florist in Kirby Gate Shopping Center where the Quince Avenue store is located. She testified that she met Pettes as a co-tenant. She also testified that Yukon came to a tenants' meeting with Pettes, sat by Pettes at the meeting, and introduced Pettes to the other tenants as his partner and co-owner.

Debbie J. Spake testified that she is a registered nurse and that she worked for Yukon part-time between 1984 and 1989. She stated that in the spring of 1987, Yukon came in the office one day very excited about a new business venture. He explained that he, Phillip Schaefgen, and a friend of Schaefgen's were discussing the purchase of a video business. Later Yukon told her that Schaefgen had withdrawn, but that he and Pettes were partners in the venture. She also testified concerning an article that appeared in a Memphis newspaper concerning the Rent–a–Flick business which quoted Pettes as saying that he was the co-owner of the business. She stated that Yukon did not deny the truth of the statements in the article.

Carlene Petrovsky testified that she had known Yukon for approximately fifteen years. She testified that he was the pediatrician for her children, and that she also knew Yukon and his wife socially. On one occasion, when she took one of her children to the doctor, Yukon told her about a new business venture that he was involved in. She said Yukon was very excited about his partner who was supposed to be knowledgeable in that business. Later, since she had considerable expertise with computers, he asked her if she would be willing to set up a computer system in the Quince store. She agreed to do so, and her compensation was free medical service for her children from Yukon. Yukon referred to Pettes as an equal owner of the business. She later started working part-time for the business, and always considered Pettes to be a co-owner of the business.

Jo Ann Sutherland testified that she was hired at the Rent–a–Flick on Quince in 1991. She first met Yukon when he came over to the store and introduced himself as Pettes's partner. In the spring of 1992, she stated that Pettes told her that he and Yukon had decided that Yukon would take the Germantown store, and that Pettes would take the Quince store. At a later time, Yukon told her that he was "washing his hands" of the Quince store, and that he was not going to have anything else to do with it. He then began removing movies from the Quince store and taking them to the Germantown store. She testified that on January 5, 1993, Dr. Yukon came to the Rent–a–Flick with a piece of paper in his hand. He told her that he had come to fire Pettes and she stated to him, "How can you fire him, he's your partner." Yukon replied that Pettes would never be able to prove it because, they did not have a written agreement.

Tom Campbell testified that in negotiating a lease in the Willow Grove Shopping Center for the Rent–a–Flick store, both Pettes and Yukon met with him and Yukon indicated that Pettes was his partner.

Defendant, Gordon Yukon, testified that he is a practicing pediatrician and that he has several other business ventures. He became interested in the video rental business, and when he learned that the Rent–a–Flick video stores were for sale, he and Phillip Schaefgen decided to form a partnership to acquire the business. Schaefgen introduced plaintiff to Yukon as someone with knowledge of the business who might be interested in working as a manager of the stores. He denies that there was any discussion between the three of them about Pettes becoming a partner. He acknowledges that there was some discussion between him and Pettes "that [partnership] would be a distinct possibility in the future, assuming I recouped my initial investment and assuming the store was profitable and he was a functionally successful manager, yes." He could not remember the exact time or place he presented to Pettes the possibility of becoming a partner or part owner in some amount at some time in the future. He denies, however, that there was any discussion initially about he and Pettes being full and equal partners. He states that originally he only offered Pettes a managerial position.

Yukon testified that he borrowed the money to purchase the business, that the business was purchased in his name and that it was a sole proprietorship. He states that since he had made this investment, he wanted to be sure that he had Pettes as an employee for at least a year. Therefore, he wrote out, and had Pettes sign the one year employment agreement. Yukon made all of the financial decisions, controlled the bank account, was the sole obligor on the leases, and reported the business to Internal Revenue Service as a sole proprietorship. W–2 forms were furnished to Pettes as an employee of the business. After about a year and a half, he gave Pettes a raise to $24,000.00 per year because he had done well the first eighteen month period. The second year the gross sales of the business had decreased, and Pettes received only a small raise to cover additional insurance expense. Pettes was never authorized to sign checks on the Rent–a–Flick account. He denies that at any time prior to November, 1992, that Pettes asked him for an accounting.

Concerning Pettes' termination of his relationship with Rent–a–Flick, we quote from Yukon's direct examination:

Q. What was your—or just describe for the Court briefly, if you will, how Mr. Pettes' status with Rent–a–Flick was terminated.

A. All right. Back in, I believe, about June of 1992 Mr. Pettes came to me and asked that he be allowed to do the payroll for the business. And I asked him why and he said that would give him more authority with the employees.

I said, "Well, that will be fine. I'll have to show you how to do it." And I gave him the checks, I signed the checks for him that were blank, 25 at a time, and gave him the peg-board system that we write the checks on and showed him how to calculate everything and he took over. And I was happy for him to do that job and get it off my shoulders.

And in about August, toward—toward the end of August my daughter Laurie moved back here from Chicago and began putting out resumes, looking for a job.

And in October one of the job opportunities required her to have knowledge of payroll and I asked Jim to give me the peg-board system back and the checks so I could teach her how to do that so she could put on her resume she was knowledgeable in doing payroll. And that's when he refused to give that back to me when he came to the office to get more checks and I said, "I'm not giving you any more checks, I want that back. She needs to learn how to do that."

And he said, "Why don't you let her do it at the Germantown store?" I said, "Because there are two employees at the Germantown store, the salaries are exactly the same, and that requires no calculation whatsoever." I said, "She needs to be able to calculate different hours at different rates." And my exact words to him were, "She's an intelligent young lady and it will take her probably about two weeks to learn how to do it."

And he said, "No, I'm not doing it. Absolutely not." And I asked him exactly what was wrong with him.

THE COURT: This was when?

THE WITNESS: Of November [sic].

THE COURT: Of '92?

THE WITNESS: Right.

THE COURT: A year ago. All right, go ahead.

THE WITNESS: That's basically it. After that happened, I just—I mean, I was in shock that he was so antagonistic and I discussed it with my family and I discussed it with my father, and my father said, "You've got"—

MR. SMITH: Your Honor, I object to the hearsay.

THE COURT: Sustained.

BY MR. GRIFFEE:

Q. Without telling us what your father said what did you decide to do and do about that?

A. That it was time for Mr. Pettes to seek employment elsewhere.

Yukon testified that he periodically deposited money in the Rent–a–Flick account to provide operating funds, but that Pettes, to his knowledge, never put any money into the account. Yukon emphatically denies that he ever discussed with Pettes the possibility that Pettes might be entitled to the Quince location of Rent–a–Flick. He testified that for the first year or two that Pettes was employed as manager of the Quince store, he was "absolutely wonderful." After that, he seemed to lose interest. In order to revive his interest, Yukon sent Pettes to Las Vegas. He acknowledged that during the first year and a half, Pettes spent many hours working in the business. However, after the first eighteen months, the time Pettes spent in the store steadily decreased until 1992. The payroll expenses increased, and Yukon questioned Pettes about the number of hours that were being paid to other employees. The increased expense was a major reason why Pettes did not get a second raise. Yukon denies that he told people in his medical office, customers of the video store and others that Pettes was his partner.

Phillip Schaefgen testified concerning his early involvement and interest in the video business, but emphatically denied that there was any discussion among the parties that Pettes would be a partner or co-owner in the business. He testified that he had no knowledge of what occurred after he withdrew, but prior to that time it was contemplated that Pettes would be an employee who would operate the business for the partnership of Schaefgen and Yukon.

At the conclusion of the proof, the chancellor announced his findings from the bench, including the following:

> I think it's obvious from the proof that Dr. Yukon strung the plaintiff along, he obviously led him to believe that there was a pot of gold down there at the end of the rainbow but the proof is inconclusive that he made a commitment to him that he would share in that pot in any precise or percentage amount.

The court then found that plaintiff had not carried his burden of proof, and judgment was entered for the defendant.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm absent error of law. T.R.A.P. 13(d).

■ "A partnership is an association of two (2) or more persons to carry on as co-owners of a business for profit." T.C.A. § 61–1–105(a) (1989). The sharing of gross returns does not of itself establish a partnership, T.C.A. § 61–1–106(3) (1989), but "the receipt by a person of a share of the profits is *prima facie* evidence that he is a partner in the business." T.C.A. § 61–1–106(4) (1989). However, no inference is drawn if the profits are received as wages of an employee. *Id.*

■ In determining whether the parties in this case are partners, no one fact or circumstances is a conclusive test, but each case must be decided upon a consideration of the totality of all relevant facts. *Roberts v. Lebanon Appliance Service,* 779 S.W.2d 793, 795 (Tenn.1989). In *Bass v. Bass,* 814 S.W.2d 38 (Tenn.1991), the Supreme Court considered the sole issue of whether there was an implied partnership. The Court said:

> [T]he existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. *Wyatt v. Brown,* 39 Tenn.App. 28, 281 S.W.2d 64, 67 (1955). Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually *intend* to become partners. *Wyatt,* 281 S.W.2d at 67. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. *Roberts,* 779 S.W.2d at 795–96. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship. *Wyatt,* 281 S.W.2d at 67. Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.

814 S.W.2d at 41. The burden of proof on the existence of a partnership is upon the one who alleges the partnership. *Mullins v. Evans,* 43 Tenn.App. 330, 308 S.W.2d 494, 498 (Tenn.App.1957).

■ In the case at bar, Pettes contends that the parties entered into an oral agreement of partnership from the beginning of their relationship. Conversely, Yukon denies this. However, Yukon does admit that at some point he discussed with Pettes that the future held the possibility of a partnership or co-ownership. It appears from the evidence that Yukon held Pettes out as his partner to the public at large, while at the same time

operating the business as a sole proprietorship by controlling the financing, business papers, and tax returns. The chancellor made no specific finding concerning credibility, but his statement that Dr. Yukon "strung the plaintiff along," indicates that he accredits Pettes's testimony to that effect. Findings of fact by the trial court involving the credibility of witnesses are entitled to great weight on appeal. *Town of Alamo v. Forcum–James Co.*, 205 Tenn. 478, 327 S.W.2d 47, 49 (1959).

Pettes asserts that in the middle of 1992, the parties agreed to work toward dividing the business so that the Germantown store would go to Yukon and the Quince store would go to Pettes. Yukon denies that there was any such arrangement. Yukon does admit, however, that after the time that this agreement was allegedly made, he removed videos from the Quince store to the Germantown store. An independent witness, Sutherland, an employee of the Quince store, corroborated the fact that he took the films from the Quince store to the Germantown store. Significantly, she testified that before Yukon did this he told her that he was "washing his hands" of the Quince store and would have nothing else to do with it. It is also significant that notwithstanding Yukon's denials of a partnership arrangement, Sutherland testified that when he advised her that he was firing Pettes, she questioned this action since Pettes was a partner. Yukon's reply was not a denial of partnership, but rather a claim that in the absence of written proof Pettes could not prove such an arrangement.

We believe from a review of the totality of the proof in this case that at least as of the middle of 1992, the parties intended a partnership and co-ownership to the extent that a dissolution agreement of the arrangement would result in Yukon acquiring solely the Germantown store and Pettes acquiring solely the Quince store. This is consistent with the chancellor's findings concerning Dr. Yukon's leading Pettes on, and we differ with the chancellor only with respect to his finding that the proof was inconclusive as to the extent of Yukon's commitment.

Accordingly, we find that the proof preponderates against the chancellor's finding that plaintiff did not carry the burden of proof and find that there was an implied partnership and agreed dissolution thereof upon the terms that Yukon would acquire solely the Germantown store and Pettes would acquire solely the Quince store. The judgment of the trial court is vacated and the case is remanded to the trial court for further proceedings to determine the value of the Quince store as of January 3, 1993, for which judgment shall be entered for Pettes. Costs of the appeal are assessed against appellee.

TOMLIN, P.J. (W.S.), concur.

HIGHERS, J., not participating.