**In re TAYLOR & ASSOCIATES, L.P., Debtor.**

**Dudley W. Taylor, Appellant,**

**v.**

**James S. Bush, et al., Appellees.**

**Nos. 95–33024, 3:96–CV–539.**

United States District Court, E.D. Tennessee at Chattanooga.

March 28, 1997.

---

David H. Jones, the Taylor Law Firm, Knoxville, TN, for Dudley W. Taylor, appellant.

Stephen A. McSween, Herbert H. Slatery, III, Reese K. Thomas, Egerton, McAfee, Armistead & Davis, P.C., Knoxville, TN, for petitioners James S. Bush and Johnson & Galyon, Inc.

C. Mark Troutman, McCord & Troutman, P.C., Knoxville, TN, for petitioners Robert E. Hall, individually, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Money Purchase Pension Plan, Robert E. Hall, M.D., Trustee for Robert E. Hall, M.D., P.A. Defined Benefit Plan, and Robert E. Hall, M.D., P.A.

## MEMORANDUM

COLLIER, District Judge.

The appellant, Dudley W. Taylor ("D.Taylor"), appeals from an Order of Relief[1] (Record 54)[2] entered on March 8, 1996 by the United States Bankruptcy Court for the Eastern District of Tennessee (Stair, C.J.). D. Taylor asserts error by the bankruptcy court in its (1) denial of appellant's Motion to Dismiss the Involuntary Petition, (2) denial to appellant of a trial on the issue of whether Taylor and Associates, L.P. ("TALP") was a limited partnership under Tennessee law, (3) denial of appellant's motion to strike the affidavit of William T. Hendon, (4) failure to dismiss the Involuntary Petition for lack of subject matter jurisdiction because the alleged debtor, TALP, is not a person eligible for relief under the Bankruptcy Code, (5) admission of certain statements of Joseph C. Taylor over appellant's objection, (6) holding that certain creditors hold claims against TALP that are not contingent nor subject to a *bona fide* dispute, (7) holding that TALP is generally not paying its debts as they become due, and (8)

1. The Order of Relief (Record 54) is accompanied by a very thorough Memorandum on Contested Involuntary Petition (Record 53). In the Memorandum, the Bankruptcy Court sets out the factual basis and legal conclusions resulting in the Order of Relief.

2. The Court will refer to the documents within the bankruptcy record as "Record ____, p. ____."

holding that the Involuntary Petition was not filed in bad faith. Following filing of the appeal, appellant filed an Emergency Motion for Stay Pending Appeal (Court File No. 5). Appellee James S. Bush ("Bush") filed a Response (Court File No. 8). D. Taylor filed a Reply (Court File No. 11).

Jurisdiction to hear appeals from bankruptcy court is conferred by 28 U.S.C. § 158.[3] In determining appeals from bankruptcy court, this Court sits as an appellate court. It reviews the bankruptcy court's findings of fact under a clearly erroneous standard, but conducts a *de novo* review of the bankruptcy court's conclusions of law. *Fed.R.Bankr.P.* 8013; *In re Isaacman,* 26 F.3d 629, 630 (6th Cir. 1994); *Harbour Lights Marina v. Wandstrat,* 153 B.R. 781 (Bankr.S.D.Ohio 1993). However, the Court may overturn matters within the discretion of the bankruptcy court only for an abuse of discretion. *Fed. R.Bankr.P.* 8003; *American Imaging Services, Inc. v. Eagle–Picher Industries, Inc. (In re Eagle–Picher Industries, Inc.),* 963 F.2d 855, 858 (6th Cir.1992); *accord, Investors Credit Corp. v. Batie,* 995 F.2d 85, 88 (6th Cir.1993).

For the following reasons, the Court will **GRANT** Appellant's Motion to Stay Pending Appeal, **VACATE** the Order of Relief entered by the bankruptcy court, and **RE-MAND** this matter for proceedings consistent with this opinion.

## I. PERTINENT FACTS

On November 13, 1995, Bush filed an Involuntary Petition under Chapter 7 of the Bankruptcy Code against TALP.[4] On

3. Section 158 provides in pertinent part:

The district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees....

4. Other individuals and entities later joined the petition and are also appellees before the Court. Some of these appellees joined Bush's motion (*see* Court File No. 7). For the sake of convenience, unless necessity dictates other-

January 26, 1996, the bankruptcy court denied a motion to dismiss the involuntary petition filed by D. Taylor.[5] Following this ruling, the bankruptcy court, on February 8, 1996, limited the contested issues at trial to just two issues: (1) whether at least three of the petitioning creditors hold non-contingent claims not subject to a bona fide dispute against TALP, and (2) whether TALP is generally not paying its debts as they become due. It considered the pleadings of the parties and arguments of counsel made at oral argument on January 23, 1996. Among the issues considered by the bankruptcy court was TALP's status as a statutorily-required "debtor" under 11 U.S.C. § 109(b).[6] The bankruptcy court framed its analysis as "determin[ing] whether [TALP] is a partnership" under Tennessee law (Record 39, p. 22). After considering both partnership and limited partnership law, the bankruptcy court concluded TALP was a "limited partnership" (*see id.* at pp. 22–35).[7]

The record on appeal discloses the following relevant facts. Because the factual findings of the bankruptcy court are critical to this appeal, the facts before the bankruptcy court must be set out in considerable detail.

### A. *Joseph C. Taylor*

Joseph C. Taylor ("J. Taylor"), who died on November 3, 1995, lived and worked in Knoxville, Tennessee as a securities broker and private businessman. He allegedly owned and operated several business entities under several different names. These business names at least included Joseph C. Taylor, Taylor & Associates, Inc., Taylor & Associates, Joseph C. Taylor & Associates, Inc., and Taylor & Associates, L.P. ("TALP"). A reasonable reading of the record supports the proposition that many, if not all, of these business entities, including J. Taylor as an individual, operated concurrently.[8] Similarly, many, if not all, of these business entities at least in part concerned the same type of business—the solicitation of investors for investing either through or in J. Taylor's business entities.

### B. *Taylor and Associates Limited Partnership ("TALP")*

In late 1993, Harold Elkins ("Elkins") approached J. Taylor about investing in Valley Medical Systems, Inc. and Valley

wise, the Court will refer to this group collectively as "Bush" or "appellees."

**5.** The bankruptcy court ruled D. Taylor had standing to contest the involuntary petition under *Fed.R.Bankr.P.* 1011(a), which states, in relevant part, "a nonpetitioning general partner, or alleged general partner, may contest the petition."

**6.** To qualify as a debtor under Section 109(b), the entity must be a "person," defined as including an "individual, partnership, and corporation." 11 U.S.C. § 101(41). *See also* 11 U.S.C. § 101(13).

**7.** The bankruptcy court's opinion is reported at *In re Taylor & Assoc., L.P.,* 191 B.R. 374 (Bankr.E.D.Tenn.1996).

**8.** The bankruptcy court holds a different opinion, at least for purposes related to issues arising under 11 U.S.C. § 303(b) and 11 U.S.C. § 303(h)(1) (*see* Record 53, p. 6):

"[T]here is no evidence in the record before the court to support a finding that Joseph C. Taylor was engaged in or operated any business other than the limited partnership business of [TALP]. While certain exhibits introduced into evidence contain references to 'Joseph C. Taylor & Associates, Inc.,' 'Joe Taylor & Assoc., L.P.,' 'Joe Taylor & Assoc.,' 'Taylor & Assoc.,' and the like, these references alone are not sufficient to permit the court to determine the existence of any corporate or proprietorship entity operated by Joseph C. Taylor. The court therefore concludes, for purposes of resolving only the issues presently before it, that all such references are to [TALP], the debtor."

*Id.* at p. 12.

Paradoxically, the bankruptcy court also recognized that Sherry M. Seay ("Seay") worked as "the corporate secretary of 'Joseph C. Taylor & Associates, Inc.' " (Record 39, p. 7; *see also* Record 12, Seay Aff. ¶ 1). Seay states she "worked for Joseph C. Taylor & Associates, Inc. since its inception ... [and she] worked with Joseph C. Taylor for over 25 years" (Record 12, Seay Aff. ¶ 2).

Medical Systems, L.P. ("Valley"). J. Taylor expressed an interest and said he would ask John Buchheit ("Buchheit") to invest with him. J. Taylor researched the proposal, agreed to invest if Buchheit joined him, and retained D. Taylor[9], an attorney at law, to prepare the paperwork necessary for forming a limited partnership, to be called TALP, which would then invest in Valley. The paperwork included a "Certificate of Limited Partnership" ("Certificate"), an "Application for Employer Identification Number" ("EIN"), and a draft partnership agreement. D. Taylor began preparing the TALP paperwork during late 1993.

The Certificate lists J. Taylor as the sole general partner, does not list any limited partners but refers to "simultaneously entering into and executing a Limited Partnership Agreement with the limited partners," and names D. Taylor as the initial registered agent. It also states that "[a] copy of the Agreement of Limited Partnership is on file at the principal office of the limited partnership and contains all of the terms and conditions agreed upon by the partners in connection with formation of the limited partnership" (Record 4, D. Taylor Aff., Ex. A). J. Taylor signed it on December 30, 1993 (id.). D. Taylor states he twice filed the Certificate and twice received notice during early 1994 that the Certificate had been denied and he then presumed it was not re-filed (see Court File No. 6, p. 5; Record 4, D. Taylor Aff. ¶¶ 8–12). D. Taylor further states he only learned in November 1995 that the Certificate had been re-filed and accepted in or about May 1994 (Court File No. 6, p. 5 and p. 5 n. 10).

D. Taylor submitted on March 9, 1994 an application for an EIN (Record 6, Hendon Aff., Ex. A).[10] Although this document is termed an "application," the EIN purportedly assigned to TALP by the Department of the Treasury, Internal Revenue Service ("IRS") in a notice dated March 16, 1994, EIN "62–1559388," already appears on the document's upper right-hand corner in the space designated for the EIN (see id., Exs. A and B). The application indicates that the business is a new partnership begun on March 9, 1994 and that the applicant, TALP, has never "applied for an [EIN] for this or any other business" (id., Ex. A). The IRS sent the notice to TALP and J. Taylor as the general partner (id., Ex. B).

D. Taylor also prepared a draft partnership agreement for the Valley investment proposal that cited Buchheit as the sole limited partner. Neither J. Taylor nor Buchheit signed the partnership agreement, nor did Buchheit participate in any way with J. Taylor in the Valley investment (Court File No. 6, pp. 5–6; Record 4, D. Taylor Aff. ¶¶ 14–17 and Ex. D). However, documents dating from March 9, 1994 to at least October 12, 1995 indicate J. Taylor and/or TALP, in some form, did invest in Valley (Record 6, Hendon Aff., Exs. C–L, T, and V). These documents include (1) memoranda and letters from D. Taylor or his office to Sandra Plummer ("Plummer"), President of Valley, (2) a letter from J. Taylor to Plummer, (3) UCC–1 forms, which show Valley as the debtor and J. Taylor and TALP as the general partner and secured party, (4) deeds of trust, which were prepared by D. Taylor's office and show D. Taylor as the trustee and J. Taylor and TALP as the beneficiary, and (5) billing records related to TALP from the McDonnell, Dyer & Taylor law firm.[11]

---

9. Notwithstanding the same last names, nothing in the record indicates J. Taylor and D. Taylor were related.

10. The bankruptcy court appointed William T. Hendon ("Hendon") as interim trustee of TALP's bankruptcy estate on November 15, 1995 (Record 6, Hendon Aff. ¶ 1).

11. Regarding the continued use of the TALP name, "D. Taylor explains that even after he became aware that Buchheit declined to participate as a partner in TALP, he did not feel comfortable in disregarding the TALP designation.... D. Taylor believed that the most cautious approach in the preparation of documents was to use the names of both J. Taylor

## C. *Use of the TALP Name*

Use of the TALP name occurred even before filing of the Certificate in 1994. A "U.S. Partnership Return of Income" Form 1065 ("Form 1065") for the 1993 taxable year lists "Taylor and Associates, L.P." as the partnership's name but "62–1525793" as the EIN (*see* Record 6, Hendon Aff., Ex. M; Record 31, Elkins Aff., Ex. A). Seven (7) "Partner's Share of Income, Credits, Deductions, etc." Schedule K–1 (Form 1065) forms ("K–1 forms") for the 1993 taxable year, including one for J. Taylor, also list "Taylor and Associates, L.P." as the partnership's name and "62–1525793" as the EIN (Record 6, Hendon Aff., Ex. N).[12]

Use of EIN "62–1559388" also occurred before the putative official receipt of that EIN. As noted above, the application for TALP's EIN already showed EIN "62–1559388" on its face before TALP received the March 16, 1994 assignment notice from the IRS. Significantly, at least seven (7) K–1 forms for the 1993 taxable year list "Taylor & Associates, L.P." as the partnership's name and "62–1559388" as the EIN (*id.*). Most of this group of K–1 forms give the tax year as January 1, 1993 to December 31, 1993; however, one gives the tax year as April 1, 1993 to December 31, 1993, and another gives the tax year as January 31, 1993 to December 31, 1993

(*id.*). Regardless which EIN the 1993 K–1 form bears, the partnership's name is the same, the partnership's address is the same, and the individual or business entity is listed as a limited partner, except for J. Taylor, who is listed as a general partner.

There are also at least thirty-nine (39) K–1 forms for the 1994 taxable year (*id.*, Ex. O). Each of these K–1 forms refers to "Taylor & Associates, L.P." as the partnership's name, uses "62–1559388" as the EIN, and lists the individual or business entity as a limited partner. Five of the same individuals or business entities for whom there are 1994 K–1 forms also had 1993 K–1 forms; this set of 1993 and 1994 K–1 forms uses "62–1559388" as the EIN (*see id.*, Ex. N and O). Eight (8) of the individuals or business entities for whom there are 1994 K–1 forms have listed as their addresses the same address as TALP: "550 Main Avenue, Knoxville, Tennessee 37902."[13]

In addition to preparing the paperwork for the TALP investment in Valley, D. Taylor and a partner in his law firm, Lori Farris Fleishman ("Fleishman"), invested with J. Taylor and recommended other people invest with him (*see* Record 6, Hendon Aff., Exs. Q, R, W, Y, and Z). At least some of these investments were specifically directed to J. Taylor at TALP (*see id.*, Exs. Q and W). One document concerning

---

as an individual and TALP" (Court File No. 6, p. 18).

**12.** Use of "62–1525793" as an EIN also continued into 1995. The record contains a Nationsbank account signatory card dated January 24, 1995 with "621–52–5793" as the EIN. The account holder is TALP, and the signatory card is signed by J. Taylor. An attached account statement lists the EIN as "62–1525793" (*see* Record 39, p. 30 and p. 30 n. 12; Record 52, Trial Ex. A).

The bankruptcy court acknowledged the discrepancy in EIN numbers and noted also that "62–1525793" had been used on several 1993 K–1 forms, but stated "[t]he parties have not explained why the signatory card lists a different identification number for [TALP]; therefore, the court finds that the different number appearing on the card is irrelevant to issues presently before the court" (Record 39,

p. 30 n. 12). Before the bankruptcy court at that time was D. Taylor's motion to dismiss. The quotation cited above appears during the bankruptcy court's analysis of TALP as a limited partnership.

**13.** Elkins, a former certified public accountant, says he prepared some K–1 forms for J. Taylor. Elkins also highlights many errors in other K–1 forms and inconsistencies between them and the Form 1065 for 1993. Although he states he invested regularly with J. Taylor, he says he never agreed to join with him or any of his other clients in a partnership of any sort. *See* Record 31, Elkins Aff. ¶¶ 12, 16–19, 24, 29–33, 36–41, 46, and 48. The record contains a 1993 K–1 form for Elkins with "62–1525793" as the EIN (*see* Record 6, Hendon Aff., Ex. N).

an investment asks J. Taylor to provide a K–1 form for an investor (*id.*, Ex. R). Two documents demonstrate D. Taylor and Fleishman delivered their own funds to J. Taylor "to be invested in some unnamed investment" (*id.*, Ex. Y; *see also id.*, Ex. Z).

The affidavit of David C. Andrew ("Andrew") gives further evidence of D. Taylor's and Fleishman's involvement with TALP. Andrew, a securities attorney hired by J. Taylor in July 1995, testifies that D. Taylor and J. Taylor both "advised [him] . . . that [TALP] was not a limited partnership but was a general partnership, and that [J.] Taylor was one of a number of general partners but was not the managing general partner" (Record 8, Andrew Aff. ¶ 3). Andrew attached to his affidavit a copy of a memorandum about "Taylor & Associates" he received from D. Taylor, which offers a "brief history of the origin and use of this Limited Partnership" (*id.*, Attached). The memorandum is dated July 24, 1995.

The memorandum first discusses the formation of TALP as a means to invest in Valley, the breakdown of the proposal, and J. Taylor's use of the TALP designation to make the Valley investment anyway. The memorandum then details D. Taylor's and Fleishman's involvement in various investment projects, including some with J. Taylor and several "temporary and/or bridge type loans to clients" (*id.*, Attached p. 2). "We subsequently utilized TALP for tax reporting purposes for the above [loan] activities, somewhat by default. . . . We did not have tax numbers for these other entities[, through which we also made loans], while TALP has had a tax number since late 1993 or early 1994" (*id.*, Attached p. 3).

In summary, TALP was initially created for the purpose of making an investment by Joe Taylor, alone, with no other persons to have an ownership. It was subsequently used by other investors, all sophisticated at least in the sense of making their own business and investment decisions and all having substantial business and investment experience, and was operated essentially as a[n] investment club. The effort to organize the entity as a limited partnership was unsuccessful, and accordingly, it can be viewed only as a general partnership, for investment purposes. I am not aware of Joe soliciting any investors for this partnership and he certainly had no control over it. If anyone had control over it as actually used, it was me[, D. Taylor,] or Lori Fleishman, or in particular, the two of us together.

(*id.*, Attached p. 4).[14]

One person with whom J. Taylor did business dating from at least 1990–91 is William W. Gilley ("Gilley") (Record 23, Gilley Depo. p. 70). Gilley states, "I believe I am a limited partner of [TALP]" (Record 9, Gilley Aff. ¶ 4). He adds, "I received a Schedule K–1, Partner's Share of Income, Credits, Deductions, etc. from Taylor & Associates, L.P. for the tax years 1993 and 1994. . . . Said Schedule K–1's listed me as a limited partner of [TALP], and I included the information in the Schedule K–1's in my federal income tax returns for the tax years 1993 and 1994" (*id.* at ¶ 3). Both of the K–1 forms to which Gilley referred list TALP as the partnership's name, give "62–1559388" as the EIN, and label Gilley as a limited partner.

Gilley's deposition testimony helps to clarify his relationship with J. Taylor and TALP. J. Taylor mentioned to Gilley in the fall of 1993 "something about he was thinking about forming a partnership" (Record 23, Gilley Depo. p. 57). Gilley asked who was involved and thinks he said

'as long as you clear this with Cathy Peters about my tax thing, that's all I'm

---

**14.** D. Taylor denies TALP is a partnership or that he was ever a partner of J. Taylor (Court File No. 6, p. 24 n. 32).

interested in.' [15] That's the last I heard about it. As far as I know, I never received any papers to ever sign organizing any partnership, general, limited or otherwise. And the next time I heard about it is when he filed the K–1 [form] with my 1993 return which I would not have seen until April or May of '94. That was the first time that I had ever got anything positive. He never said anything more about it. ·

(*id.*) (footnote added). Gilley testified he never signed a partnership agreement or agreed to be a partner with J. Taylor (*id.* at p. 59). He briefly discussed sharing profits and losses with J. Taylor soon after he received the 1993 K–1 form but apparently did not further question him about the alleged partnership (*id.* at pp. 59–60). When asked about the preparation of the affidavit he signed, Gilley said, "did I realize that I was in a limited partnership, ·... I said yeah. After I got those K–1's and asked [J. Taylor] about it, I said that I was—that that was the extent of the—my knowledge of the limited partnership other than talking to [J.] Taylor" (*id.* at pp. 62–3). Gilley states he never saw the Valley Certificate or the Valley draft partnership agreement until he received copies of them from bankruptcy court (*see id.* at pp. 68–9).

## II. *ORAL ARGUMENT*

This Court heard oral arguments in this matter on March 7, 1997. At the oral argument, the following exchange occurred between the Court and Stephen A. McSween ("McSween"), attorney for Bush:

The Court: Are you familiar with the term "Ponzi scheme"?

McSween: Yes.

The Court: Would you characterize what Mr. [J.] Taylor was doing as a Ponzi scheme?

McSween: I would characterize it as a Ponzi scheme. The only difference between it and the typical Ponzi scheme is that usually, when the money gets to a certain level, the perpetrator of the scheme absconds with the money.

In this case that did not happen. In fact, the trustee found just approximately $50,000, I think, in total funds, even though millions and millions of dollars had flown through the partnership. But it would be a Ponzi scheme.

The Court: Since you concede that there was a Ponzi scheme involved, do you also concede that Mr. [J.] Taylor was committing fraud?

McSween: Mr. Joseph Taylor was? Yes.

The Court: Yes.

McSween: Yes. It was fraud in that he was telling people that the limited partnership was going to make certain investments, and, to our knowledge, none of these investments were ever made. In fact, he would take the money—

The Court: He was deceiving people?

McSween: Yes.

The Court: He was misrepresenting things?

McSween: Yes.

The Court: He was lying to people?

McSween: That's right. But I wouldn't concede that the only claims that these people have against the limited partnership are tort claims. I mean, they also have breach of contract claims. They gave him the money, and had a contract, in most instances an express contract, that they would receive money back.

(Court File No. 13, Oral Argument pp. 18–20; *see also id.* at pp. 36–40).

**15.** From the deposition it is unclear what "tax thing" Gilley means. The pages preceding discuss a likely understanding. Gilley paid a $700.00 tax penalty in the fall of 1993 because he did not estimate enough taxes related to another business project or investment he had with J. Taylor (Record 23, Gilley Depo. pp. 49–57).

### III. *STANDARD OF REVIEW*

As part of D. Taylor's motion to dismiss and in response to it, the parties filed affidavits and materials outside the pleadings. The bankruptcy court treated the motion as one for summary judgment (Record 39, p. 17 n. 6); *see Fed.R.Bankr.P.* 7012(b) (incorporating *Fed.R.Civ.P.* 12(b)); *Fed.R.Bankr.P.* 7056 (incorporating *Fed. R.Civ.P.* 56). The court also recognized the motion was "not expressly grounded on Rule 12(b)(6)" (Record 39, p. 17 n. 6). In fact, D. Taylor's first basis for dismissing the petition reads: "[TALP] is not an entity that qualifies as a Debtor under 11 U.S.C. § 109(b)" (Record 2, p. 1). To qualify as a debtor under Section 109(b), the entity must be a "person," defined as including an "individual, partnership, and corporation." 11 U.S.C. § 101(41); *see also* 11 U.S.C. § 101(13). TALP is a debtor under Section 109(b) if it is either a limited partnership or a partnership. If TALP is not a debtor, the petition should be dismissed.

The bankruptcy court reviewed and weighed the facts, found no genuine issue of material fact existed as to the status of TALP, and, in denying the motion, made the legal conclusion that TALP was a limited partnership. The result below appears to be atypical under summary judgment jurisprudence: the court denied *the movant's motion* on grounds no genuine issue of material fact existed, yet then made a specific legal conclusion *against the movant* based upon the very factual grounds the movant argued warranted dismissal. This result more closely resembles the result of a *Fed.R.Civ.P.* 12(b)(1) analysis. *Cf. Ohio Nat'l Life Ins. Co. v. United States,* 922 F.2d 320, 325 (6th Cir. 1990) (noting a trial court may consider documents outside the complaint and conduct a limited evidentiary hearing without converting a Rule 12(b)(1) motion into a motion for summary judgment).

■ The Court will construe D. Taylor's motion as a challenge to subject matter jurisdiction under Rule 12(b)(1). *See In re Cash Currency Exchange, Inc.,* 762 F.2d 542, 545–46 (7th Cir.1985) (determining challenges under Section 109(b)(2) are jurisdictional); *Selcke v. MedCare HMO,* 147 B.R. 895, 899 (N.D.Ill.1992) (same); *In re Southern Industrial Banking Corp.,* 59 B.R. 978, 979–80 (E.D.Tenn.1986) (same); *see also Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990) (considering a Rule 12(b)(1) motion before a Rule 12(b)(6) motion because the latter becomes moot if a court lacks subject matter jurisdiction). "It is axiomatic that federal courts are courts of limited jurisdiction, and as such, are under a continuing duty to satisfy themselves of their jurisdiction before proceeding to the merits of any case." *Packard v. Provident National Bank,* 994 F.2d 1039, 1049 (3rd Cir.1993).

■ Under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Moir,* 895 F.2d at 269; *Rogers v. Stratton Indus.,* 798 F.2d 913, 915 (6th Cir.1986). A Rule 12(b)(1) motion may take two forms. First, if it attacks the face of the complaint, the plaintiff's burden "is not onerous." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1248 (6th Cir.1996). In reviewing a facial attack, courts must consider the factual allegations as true. *RMI Titanium Co. v. Westinghouse Elec. Corp.,* 78 F.3d 1125, 1134 (6th Cir.1996). Second, if the motion attacks the factual basis for subject matter jurisdiction, a court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case ... [because] no presumptive truthfulness attaches to the plaintiff's allegations." *RMI Titanium,* 78 F.3d at 1134 (quoting *Mortensen v. First Fed. Savings and Loan Ass'n,* 549 F.2d 884, 890 (3d Cir.1977)); *see also Rogers,* 798 F.2d at 915 (noting courts are "empowered to resolve factual disputes"). D. Taylor's motion was not a facial attack; it strenuously argued the facts and proffered materials outside the pleadings.

Courts must exercise caution before ruling on a Rule 12(b)(1) motion without first having "a preliminary hearing or hearing at trial to determine any disputed facts upon which the motion or the opposition to it are predicated." *Commodities Export Co. v. United States Customs Serv.*, 888 F.2d 431, 436 (6th Cir.1989); *see also Osborn v. United States*, 918 F.2d 724, 730 (8th Cir.1990) (noting "any rational mode of inquiry will do"). A hearing is not required, though, unless the court finds genuine issues of material fact exist. *Commodities Export*, 888 F.2d at 436 (using the Rule 56(c) standard). Where the facts are simple and uncontroverted and the law is not complex, a court may rule on a Rule 12(b)(1) motion without making findings on disputed factual issues. *Id.* at 436–37.

When the facts are complicated and when resolution of the jurisdictional issue is intertwined with the merits of the case and largely depends on a better grasp of the facts, courts either consider the motion as one for summary judgment or allow a trial on the merits. *See Holt v. U.S.*, 46 F.3d 1000, 1003 (10th Cir.1995); *Osborn*, 918 F.2d at 730; *Commodities Export*, 888 F.2d at 437–38; *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987). *Wheeler* is instructive. The *Wheeler* court reasoned jurisdictional issues and merits are intertwined "[w]hen subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case." *Wheeler*, 825 F.2d at 259 (reviewing whether a defendant was an "employer" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and whether a particular investment was a "security" under securities laws) (citations omitted).

"On an appeal the district court . . . may affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings." *Fed.R.Bankr.P.* 8013. "Where a trial court's ruling on jurisdiction is based in part on the resolution of factual disputes, a reviewing court must accept the district court's factual findings unless they are clearly erroneous." *RMI Titanium*, 78 F.3d at 1135 (citations omitted); *see also Fed.R.Bankr.P.* 8013. The facts in this case are not in dispute. It is the legal ramifications of the facts the parties contest. Review of the lower court's application of the law to the facts warrants a *de novo* review. *RMI Titanium*, 78 F.3d at 1135; *see also Saltsman v. United States*, 104 F.3d 787, 789 (6th Cir. 1997) (making a *de novo* review of a motion to dismiss granted for lack of subject matter jurisdiction).[16]

## IV. *DISCUSSION*

Determination of subject matter jurisdiction is potentially dispositive of this appeal. Because resolution of this issue subsumes several of the remaining issues, the Court will only address whether the evidence before the bankruptcy court was sufficient to conclude no genuine issues of material fact remain regarding TALP's legal status as a limited or general partnership.

### A. *Limited Partnerships*

In 1988, Tennessee adopted the Tennessee Revised Uniform Limited Partnership Act ("TRULPA"), codified at Tenn.Code Ann. §§ 61–2–101 to 61–2–1208 (1989 and Supp.1996), which became effective January 1, 1989. *See* Tenn.Code Ann. §§ 61–2–1202 and 61–2–1204(a); *In re Pioneer Inv. Services Co.*, 141 B.R. 635, 647 n. 23 (Bankr.E.D.Tenn.1992). TRULPA defines a limited partnership as "a partnership formed by two (2) or more persons under

16. At oral argument before this Court, David H. Jones ("Jones"), counsel for D. Taylor, argued the standard of review was clearly erroneous for issues of fact and *de novo* for issues of law (Court File No. 13, Oral Argu-

ment p. 6). McSween contended, "I think, in reality, what was filed was not a 12(b)(6) motion but a 12(b)(1) motion to dismiss for lack of jurisdiction" (*id.* at p. 21).

the laws of the state of Tennessee, and having one (1) or more general partners and one (1) or more limited partners." Tenn.Code Ann. § 61–2–101(8). If one can reach the conclusion TALP was actually a partnership, then there is no dispute that J. Taylor served as the general partner of TALP.

TRULPA defines a "limited partner," in pertinent part, as "a person who has been admitted to a limited partnership as a limited partner as provided in §§ 61–2–201 and 61–2–301." *Id.* § 61–2–101(7). Section 61–2–201 pertains to the execution of a Certificate and the formation of a limited partnership:

A limited partnership is formed at the time of the filing of the initial certificate of limited partnership with the secretary of state or at any later date or time specified in the certificate of limited partnership if, in either case, there has been substantial compliance with the requirements of this section.

*Id.* § 61–2–201(c).

All of the general partners, of which there must be at least one, must execute the certificate of limited partnership. *Id.* § 61–2–201(a). A partnership agreement "shall not be filed." *Id.* § 61–2–201(b). A "partnership agreement [is] any agreement, written or oral, of the partners as to the affairs of a limited partnership and the conduct of its business." *Id.* § 61–2–101(11). " 'Partner' means a limited or general partner." *Id.* § 61–2–101(10).

Section 61–2–101(7) also requires compliance with Section 61–2–301, which states, in pertinent part:

(a) In connection with the formation of a limited partnership, a person acquiring a partnership interest as a limited partner is admitted as a limited partner of the limited partnership upon the latter to occur of:

(1) The formation of the limited partnership[, *see* Section 61–2–201(c)]; or

(2) The time provided in and upon compliance with the partnership agreement or, if the partnership agreement does not so provide, when the person's admission is reflected in the records of the limited partnership.

(b) After the formation of a limited partnership, a person acquiring a partnership interest as a limited partner is admitted as a limited partner of the limited partnership:

(1) In the case of a person acquiring a partnership interest directly from the limited partnership, at the time provided in and upon compliance with the partnership agreement or, if the partnership agreement does not so provide, upon the consent of all partners and when the person's admission is reflected in the records of the limited partnership. . . .

*Id.* § 61–2–301(a)(1), (2), and (b)(1).

Being a limited partner has significant legal benefits. "[A] limited partner is not liable for the obligations of a limited partnership, unless he is also a general partner or, in addition to the exercise of rights and powers as a limited partner, he participates in the control of the business." *Id.* § 61–2–302(a); *see also In re Pioneer Inv. Services Co.,* 141 B.R. at 647–48. If a limited partner does participate in the control of the business, "he is liable only to persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner." Tenn.Code Ann. § 61–2–302(a); *see also Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1499 (11th Cir. 1996) (reviewing Alabama law).

On the other hand, "a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners." Tenn.Code Ann. § 61–2–403(a). In a partnership without limited partners, "[a]ll partners are liable jointly and severally for everything chargeable to the partnership." *Id.* § 61–1–114; *see also In re Pioneer Inv. Services Co.,* 141

B.R. at 647–48; *Life Care Centers v. Charles Town Associates,* 79 F.3d 496, 502–05 (6th Cir.1996) (comparing the "distinct nature[s]" of partnerships and limited partnerships).

TRULPA does not require a written partnership agreement. *See* Tenn.Code Ann. § 61–2–101(11) (a partnership agreement is "any agreement, written or oral, of the partners"); *id.* § 61–2–201(b) ("The partnership agreement shall not be filed."). Many of TRULPA's provisions are default provisions: a limited partner has certain statutory rights *unless* the partnership agreement states differently. *See id., e.g.,* § 61–2–108 ("Except as provided in the partnership agreement...."); *id.* § 61–2–109(a)(1) ("Subject to such standards and restrictions, if any, as are set forth in its partnership agreement, ..."); *id.* § 61–2–109(b) ("Unless limited by its partnership agreement, ..."); *id.* § 61–2–109(d) ("Unless the partnership agreement provides otherwise, ..."); *id.* § 61–2–201(a)(5) ("Any other matters not inconsistent with the partnership agreement which the partners determined to include therein."). Default provisions can therefore serve in lieu of a written partnership agreement.

■ Nonetheless, TRULPA implicitly presumes a limited partnership will operate from some kind of agreement or understanding between the partners. It is axiomatic that business associates, whether joint venturers, partners, or limited partners, to a minimum degree jointly agree to and understand the purpose, intent, and goal of their business relationship. Indeed, the partners of a limited partnership must agree "as to the affairs of a limited partnership and the conduct of its business." *See id.* § 61–2–101(11) (defining a partnership agreement). Section 61–2–301, in relevant part, is instructive:

(a) In connection with the formation of a limited partnership, a person acquiring a partnership interest as a limited partner is admitted as a limited partner of the limited partnership *upon the latter to occur of:*

(1) The formation of the limited partnership[, *see* Section 61–2–201(c) ]; or

(2) *The time provided in and upon compliance with the partnership agreement or, if the partnership agreement does not so provide, when the person's admission is reflected in the records of the limited partnership.*

(b) After the formation of a limited partnership, a person acquiring a partnership interest as a limited partner is admitted as a limited partner of the limited partnership:

(1) In the case of a person acquiring a partnership interest directly from the limited partnership, *at the time provided in and upon compliance with the partnership agreement or, if the partnership agreement does not so provide, upon the consent of all partners and when the person's admission is reflected in the records of the limited partnership....*

*Id.* § 61–2–301(a)(1), (2), and (b)(1) (emphasis added).

■ An analysis of TRULPA reveals people wanting to form a limited partnership cannot just stumble into one. The statutory requirements for becoming a limited partner are significant; the benefit of limited liability exacts a price. "Generally, limited partnerships are creatures of statute, and statutory compliance establishes their existence." *Hayes v. FPI Nursery Partners 1984–I,* No. 90–15224, 936 F.2d 577 (Table), 1991 WL 103447, at p. *3 (9th Cir. June 11, 1991) (citation omitted); *see also In re Drimmel,* 108 B.R. 284, 287 (Bkrtcy.D.Kan.1989) (noting limited partnerships, as "creatures of statute[, ...] must be defined").

Limited partnerships are creatures of statute.... Unlike a general partnership, a limited partnership cannot be created by informal agreement; its existence depends on compliance with the Uniform Limited Partnership Act.... [F]iling defects affect the liability of the ostensible limited partners.

*Continental Waste System, Inc. v. Zoso Partners,* 727 F.Supp. 1143, 1146 (N.D.Ill. 1989) (applying Illinois law).

## B. *Circumstantial Evidence of Limited Partnership*

There is certainly evidence in this case supporting the existence of a limited partnership. There is a filed Certificate, an EIN, a bank account, correspondence, billing records, checks, and a pervasive use of the putative limited partnership's name. Absent, though, is sufficient evidence of an agreement or understanding between the alleged partners, the absence of which is indicative of an even greater missing element: an identifiable limited partner. The Certificate filed on behalf of TALP states "[a] copy of the Agreement of Limited Partnership is on file at the principal office of the limited partnership and contains all of the terms and conditions agreed upon by the partners in connection with formation of the limited partnership" (Record 4, D. Taylor Aff., Ex. A; Record 32, Ron H. Mabry Aff., Attached ¶ 5; Record 35, Robert L. Fannon Aff., Attached ¶ 5). Other than the draft partnership agreement D. Taylor prepared for the Valley investment with Buchheit, the parties have not pointed to another partnership agreement. Significantly, the records of TALP do not reflect the name of a limited partner.

## C. *Use of the TALP Name*

Undoubtedly, the record shows the pervasive use of the TALP name. There were at least four different contexts in which someone referred to TALP. First, J. Taylor requested D. Taylor to draft a limited partnership agreement for the Valley investment with Buchheit. D. Taylor also filed the Certificate and requested the EIN for this investment. Buchheit, though, did not participate in the Valley investment. Second, without Buchheit, J. Taylor invested in Valley. The record demonstrates D. Taylor continued to use the TALP name in correspondence with J. Taylor even after he knew Buchheit chose not to join the Valley investment; however-

er, the record does not reflect the participation of anyone else in the Valley investment. Thus, for both contexts in which there was an investment in Valley purportedly by TALP, there were no limited partners.

The third context is more complex. It is more complex because it draws upon the vast majority of the circumstantial evidence supporting the existence of TALP as a limited partnership: J. Taylor's solicitation of investors, the K–1 forms, the EINS, the correspondence, the bank account, and the checks. The weight of this evidence is seductive but misleading. This third context is also complex because it involves the particular allegations of the appellees.

Understanding the nature of the appellees' and other investors' "investments" is key to determining whether they became limited partners in TALP. The record demonstrates J. Taylor solicited potential investors for specific investment opportunities. He very often solicited business from the same people. If those solicited wanted to participate, they would send J. Taylor funds, which he represented would purchase investments, such as securities, stocks, or a bond issue, he had discussed with them. Rarely, if ever, would the investors receive documentation of their "investments," but occasionally they would receive "returns" or "dividends." J. Taylor did not ask them to become limited partners in TALP, and they did not think they were limited partners or partners with J. Taylor. *See* Record 7, Bush Aff. ¶ 1; Record 27, Fleishman Aff. ¶ 5; Record 29, Carolyn C. Karnes Aff. ¶¶ 3 and 6; Record 30, Jane F. Campbell Aff. ¶¶ 3, 6, and 7; Record 31, Elkins Aff. ¶ 41; Record 32, Ron H. Mabry Aff. ¶¶ 3 and 6; Record 33, Vickie Mabry Aff. ¶¶ 3, 6, and 7; Record 34, David Fugate Aff. ¶¶ 3, 4, and 5; Record 35, Robert L. Fannon Aff. ¶¶ 3, 5, and 6; Record 36, R. Wayne Culbertson Aff. ¶¶ 5 and 7; Record 37, John F. Miller Aff. ¶¶ 3, 4, and 5. There is also a corresponding K–1 form for all of this group of

cited investors except for Bush and Fleishman (*see* Record 6, Hendon Aff., Exs. N and O).

Gilley's relationship with J. Taylor followed a similar pattern. Gilley never signed any type of partnership agreement or received any paperwork about a partnership. He talked very little with J. Taylor beyond J. Taylor's initial suggestion of joining a limited partnership, other than briefly discussing sharing profits and losses with him soon after he received the 1993 K–1 form. Gilley only saw the Valley Certificate and draft partnership agreement after this matter had been filed in bankruptcy court. At the oral argument the Court held on March 7, 1997, McSween heavily relied on Gilley's belief he was a limited partner for the proposition TALP *had* at least one limited partner (*see* Court File No. 13, Oral Argument pp. 26–7). McSween conceded Gilley's involvement "was purely that he gave the money, that he thought it was a partnership, that he got the K–1's, [and] that he paid his taxes based upon the K–1's" (*id.*). The only difference between Gilley and other investors is Gilley's *belief* he was a partner, yet it is this single difference upon which appellees rely when classifying Gilley as a limited partner in TALP. His *belief*, without more, is insufficient to support a finding he was a limited partner in TALP.

The testimony provided by certain investors supports a finding they invested *through* J. Taylor and TALP rather than *with or in* TALP. These investors expected returns from particular investments, such as securities, stocks, or bonds, but not from any specific growth or profits generated by TALP itself. That many of these investors received K–1 forms yet never agreed to become limited partners or partners with J. Taylor in TALP calls into question, first, whether J. Taylor used the K–1 forms to record TALP's alleged profits *or* alleged profits from the investments he presented to potential investors and, ultimately, whether TALP was a limited partnership.

Although the evidence ostensibly proving TALP was a limited partnership is abundant, this evidence—J. Taylor's solicitation of investors, the K–1 forms, the EINs, the correspondence, the bank account, and the checks—is purely circumstantial. Absent is sufficient evidence of the requisite nexus linking the K–1 forms, a valid Certificate for *this third version* of TALP, and an agreement or understanding of some sort between and among the investors and J. Taylor they expected a return or dividend from TALP itself. *See G.P. Renflo, Inc. v. Renaissance By Lake Ivanhoe, Inc.*, No. 94–1823, 70 F.3d 1271 (Table), 1995 WL 697222, at pp. *1, *3 (6th Cir. Nov. 21, 1995) (reversing and remanding for a factual inquiry into the parties' actual intent regarding their limited partnership agreement). As the evidence stands, it supports a finding TALP, through J. Taylor, in this third context, acted more like a securities brokerage firm than a limited partnership.

The fourth context involving use of the TALP name is D. Taylor's and Fleishman's appropriation of it for their own use for various investment projects, including some personal investments with J. Taylor and several temporary and/or bridge type loans to clients. "We subsequently utilized TALP for tax reporting purposes for the above [loan] activities, somewhat by default. . . . We did not have tax numbers for these other entities[, through which we also made loans], while TALP has had a tax number since late 1993 or early 1994" (Record 8, Andrew Aff., Attached p. 3). D. Taylor stated in a memorandum he prepared:

> In summary, TALP was initially created for the purpose of making an investment by Joe Taylor, alone, with no other persons to have an ownership. It was subsequently used by other investors, all sophisticated at least in the sense of making their own business and investment decisions and all having substantial business and investment experience, and was operated essentially as a[n] invest-

**446**

ment club. The effort to organize the entity as a limited partnership was unsuccessful, and accordingly, it can be viewed only as a general partnership, for investment purposes. *I am not aware of Joe soliciting any investors for this partnership and he certainly had no control over it. If anyone had control over it as actually used, it was me[, D. Taylor,] or Lori Fleishman, or in particular, the two of us together.*

(*id.*, Attached p. 4) (emphasis added). The record does not reflect a Certificate exists for this particular use of the TALP name. Significantly, there is no link between *the types of activities perpetrated under this use of the TALP name* and *the appellees' allegations.* They allege J. Taylor, through TALP, defrauded them; they do not allege D. Taylor or Fleishman solicited them on behalf of TALP.[17]

That there were multiple contexts in which TALP was used, and from these contexts appear circumstantial evidence of a limited partnership, does not *ipso facto* create a limited partnership. All of the signs and steps of the limited partnership must form a straight line. Appellees contend TALP, whether a limited partnership or a general partnership and including D. Taylor's and Fleishman's use of the TALP name, "had one continuous existence ... trace[d] back [to] the first bank account that was opened in the name Taylor & Associates, L.P." (Court File No. 13, Oral Argument pp. 29–30; *see also id.* at pp. 40–1). Appellees acknowledge the myriad difficulties of this contention, though, in light of the many investors who likely created a different limited partnership or partnership each time they invested through or withdrew from TALP (*see id.* at pp. 30–2, 41–2).

Given that a limited partnership is a "creature of statute," the presence of statutory prerequisites is mandatory. The

Court finds the evidence supporting the existence of TALP as a limited partnership lacks some of those elementary prerequisites: a valid Certificate, an agreement or understanding between the alleged partners, and at least one limited partner. On the evidence presented in the various pleadings filed before the bankruptcy court, the Court cannot as a matter of law determine a limited partnership existed. Stated differently, based on the facts before the bankruptcy court, the conclusion no genuine issue of material fact existed is not supported. Accordingly, the bankruptcy court's holding TALP was a limited partnership is **VACATED.**

### D. *General Partnership*

 Tennessee defines a partnership as "an association of two (2) or more persons to carry on as coowners a business for profit." Tenn.Code Ann. § 61–1–105(a). Generally, the "receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business." *Id.* § 61–1–106(4). When "determining whether [a person] is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties." *Bass v. Bass*, 814 S.W.2d 38, 41 (Tenn.1991); *see also Pettes v. Yukon*, 912 S.W.2d 709, 715 (Tenn.Ct.App.1995) (noting courts look to "the totality of all relevant facts").

[T]he existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties.... Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners.... The existence of a partnership is not a

**17.** At oral argument, McSween acknowledged that investors chose to invest in TALP because of J. Taylor: "It was him. And if it was a legal entity, it was him. It was his abilities

within that legal entity that they were interested in" (Court File No. 13, Oral Argument p. 39).

question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts.... *It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship.... Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a business relationship for profit, combining their property, labor, skill, experience, or money.*

*Bass,* 814 S.W.2d at 41 (citations omitted) (emphasis added); *see also Wright v. Quillen,* 909 S.W.2d 804, 808 (Tenn.Ct.App. 1995) ("[T]he circumstances must show that the parties intended to share the profits from their joint enterprise."). The party who alleges the existence of a partnership bears the burden of proof. *Pettes,* 912 S.W.2d at 715.

 While it is clear establishing the existence of a partnership is a less rigid process than for a limited partnership, there must still be sufficient evidence of "the intent to do the things which constitute a partnership ... [which] may be implied from the circumstances *where it appears that the individuals involved have entered into a business relationship for profit,* combining their property, labor, skill, experience, or money." *Bass,* 814 S.W.2d at 41 (emphasis added); *see also Smithson v. White,* No. 87–380–II, 1988 WL 42645, at p. *4 (Tenn.Ct.App. May 4, 1988) (noting a partnership "can only arise by a voluntary agreement between the parties").

 Tennessee courts have analyzed whether a partnership agreement exists in light of contract law. *See Bass,* 814

S.W.2d at 41 (noting "a contract of partnership, either express or implied, is essential to the creation of partnership status"). "[W]hile it is not essential that ... [contracts of partnership] be in writing, nevertheless, when an oral contract is sought to be enforced the [triers] of fact are required to carefully scrutinize and weigh the evidence, and should be satisfied of its existence by clear and convincing proof." *Wheeler v. Haley,* No. 91–267–I, 1993 WL 398489, at p. *4 (Tenn.Ct.App. Oct.1, 1993) (citation omitted). "[T]o be an enforceable contract it must, among other elements, result from *a meeting of the minds in mutual assent to terms,* must be based upon sufficient consideration, and *must be sufficiently definite." Id.* at p. *5 (citations omitted).

Whether a general partnership existed would rest upon consideration of precisely who were the partners, when exactly was the partnership formed, how long did the partnership last, was it dissolved by the withdrawal of partners, and what was the purpose of the partnership. Complicating the analysis here to some degree is that appellee, in arguing the continuous existence of one partnership, concedes that withdrawal of one partner operates to dissolve the partnership.[18] Another complication is the legal significance of additional partners joining an existing partnership.

The record below is insufficient to allow the Court to conclude a general partnership formed and consisted of particular individuals at any precise time. Since a conclusion the investors were general partners may open them to claims against TALP and/or Joseph C. Taylor, individually, such individuals might well take strong exception to any such finding.

 Considering all relevant facts, actions, and conduct of the parties, the record does not contain sufficient evidence to

---

**18.** At oral argument, Mr. McSween stated, "If it's a formal withdrawal of the partner, it causes a dissolution of the partnership. I believe that's textbook law. I haven't re- searched it, but I believe that's what happens." (Court File No. 13, Oral Argument p. 31).

conclude the parties entered into a business relationship for profit by combining their property, labor, skill, experience, or money. Though a written partnership is not required, absent is evidence one existed. Also absent is evidence of the intent to do the things which constitute a partnership. Such evidence would show each party recognized, accepted, or understood *its own contribution* to the business relationship, as well as acknowledged the contribution of the other party, as part of a *joint effort.* None of the four contexts discussed above reveals a joint effort to produce a profit or the receipt by a person of a share of the profits from a joint effort. On a *de novo* review of the evidence presented in the various pleadings filed before the bankruptcy court, the Court cannot as a matter of law determine a partnership existed.

## V. *CONCLUSION*

The Court finds the evidence in the record on appeal is insufficient to support a finding there is no genuine issue of material fact TALP was either a limited partnership or a general partnership. Accordingly, appellant's Motion for Emergency Stay Pending Appeal will be **GRANTED,** the Order of Relief is **VACATED,** and this matter **REMANDED** for proceedings consistent with this opinion.

An Order will enter.